IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | Case No. 1:16-CR-224 |
| | ) | |
| DAN HORSKY, | ) | Honorable T. S. Ellis III |
| | ) | |
| Defendant. | ) | Sentencing: February 10, 2017 |
| | ) | 9:00 a.m. |

POSITION OF THE UNITED STATES WITH RESPECT TO SENTENCING

The United States hereby submits its position on the sentencing of the defendant Dan Horsky ("defendant" or "Horsky") in accordance with U.S.S.G. §6A1.2 and the policy of this Court. As explained below, the government believes that the Sentencing Guidelines have been correctly calculated at a total offense level of 25 (57 to 71 months) with a criminal history category of I and a fine in the range of $20,000 to $200,000. Taking into account the factors set forth in 18 U.S.C. § 3553(a) and the government's filing under seal, the government makes a final sentencing recommendation of twenty (20) months of imprisonment, three (3) years of supervised release, a fine in the Court's discretion, and a $100 special assessment.

**I.  Background**

**A.  Offense Conduct**

Horsky is a highly successful and sophisticated educator and investor. He earned a Ph.D. in economics and spent 40 years building a prestigious body of research and a preeminent reputation in his field of marketing. Over a 15-year period, Horsky applied his knowledge of marketing to invest virtually everything he had in two successive companies. In a testament to his academic acumen and his willingness to take exceptional risk, those investments grew from

15007375.1

approximately $500,000 to greater than $220 million over those 15 years. But that extraordinary tolerance for accepting risk in exchange for high reward was not limited to just the possibility that the companies he invested in might fail. Over those 15 years, in an effort to avoid paying millions due the U.S. Treasury, Horsky also engaged in a complicated criminal scheme to evade his taxes by using the identities of relatives and nominee tax haven entities to conceal his assets.

1.  **The Scheme Begins**

Horsky's tax evasion scheme began in January 2000 when Horsky opened an account in the name of "Horsky Holdings," a nominee tax haven entity, at a bank in Switzerland ("International Bank") and deposited physical shares of Company A, an online auction company, that had experienced a meteoric rise in its stock price. Horsky opened the account in the name of an entity in order to conceal his ownership of the assets in the account. Horsky identified himself and a relative ("Person B") as beneficial owners of the assets in the account. Horsky controlled the account by making himself the sole signatory. Person B was an ideal nominee as – at the time of account opening – Person B was 88 years old, wheel chair-bound and had been ill for several years.[1] To add an additional layer of concealment, Horsky stated on account opening documents that he resided in Israel even though he had lived in the United States for over 25 years. Despite the account documentation, Horsky never concealed from bankers at International Bank that he resided in the United States.

The value of Company A fluctuated wildly over the next few years. For example, in April 2000, Company A was worth £2 billion; by December of that same year Company A's valuation had fallen to £62 million.[2] By February 2006, the value of Company A rose to £194

---

[1] Person B died several months after Horsky opened the Horsky Holdings account.
[2] Company A's stock was traded on the London Stock Exchange. As such, the value of the company is stated in British pounds.

15007375.1

million. Despite the price volatility, Horsky mortgaged his house and drained his credit cards to make additional investments in Company A.

### 2. S.Y. Holdings

In 2005, Horsky caused Person C, a foreign national and resident, to open an account in the name of a nominee tax haven entity, S.Y. Management. Although Person C was the nominal owner of S.Y. Management, Horsky sought to exploit the account to shield his ownership of the Horsky Holdings. Horsky utilized the S.Y. Management account as a conduit through which he could facilitate the transfer of funds to or from Switzerland. That is, he would not transfer assets directly between the Horsky Holdings account and accounts that he controlled in the U.S. Instead, Horsky would route transfers through the S.Y. Management account in order to eliminate any link between the Horsky Holdings account in Switzerland and accounts that he controlled in the U.S.

### 3. Horsky Cashes In and Conceals his Gain

In or around December 2007, Company B announced that it would acquire Company A in a cash-for-stock transaction with a closing date in March 2008. Horsky expected to receive approximately $80 million (from an initial investment of approximately $500,000). Company B's purchase of Company A closed on or about March 7, 2008 and payment was made on or about March 20, 2008.

In order to conceal his massive gain from U.S. authorities, Horsky – with the assistance of International Bank employees – put into motion an elaborate plan to transfer funds from Switzerland to the U.S. while concealing his ownership of the Horsky Holdings account.

15007375.1

### i. The White Account

First, on or about March 5, 2008, Horsky opened an account at International Bank in his own name (the "White Account"). Horsky provided International Bank with the following documents: an executed form entitled "Assets and Income Declaration of U.S. persons" on which he identified himself as a U.S. taxpayer; a copy of his U.S. passport; a signed signature card; and a signed Form W-9, on which he declared his home in Rochester, New York to be his domicile. Over the next two weeks, before the Company A shares were cashed out, Horsky caused International Bank to transfer just under 200,000 shares of Company A – worth approximately $8 million – to the White Account. Once the shares were cashed out, International Bank assisted Horsky to transfer the proceeds to accounts he held in his name in the U.S. Account records reflect that Horsky informed International Bank that he intended to use these funds to pay U.S. tax. In email exchanges with a relationship manager at International Bank in Switzerland, Horsky candidly discussed that he was disclosing the White account to U.S. authorities. For example, in May 9, 2008 and May 16, 2008 emails between Horsky and the Relationship Manager, Horsky called the White Account the "USA reported DH" account and ordered transfers from the account to the U.S.[3]

### ii. Change in Ownership of the Horsky Holdings Account

Second, in March 2008, Horsky nominally changed the ownership of the Horsky Holdings account at International Bank by providing a form that identified Person C as the sole beneficial owner of the assets in the account. As with the S.Y. Management account, Horsky

---

[3] On April 14, 2009, the relationship manager at International Bank noted in account records that Horsky was closing the White Account and transferring the remaining funds to the United States. The relationship manager wrote that Horsky "fully declared the[] assets" in the White Account and confirmed that the account was "flagged as American with us."

retained sole signature authority over the account, excluding Person C from accessing the assets.[4] By substituting Person C as the sole beneficial owner, Horsky could claim -- if ever questioned – that the Horsky Holdings account did not belong to him. In truth and fact, Person C never met or communicated with any International Bank employees.[5] Despite the re-papering of the ownership of the account, Horsky retained control over the Horsky Holdings account.

### iii. The Black Account

Third, on April 27, 2008, Horsky provided the Relationship Manager with account opening forms for a second account to be held in his own name (the "Black Account"). Horsky intended to use the Black Account to have access to the funds at International Bank but to do it in a way that Horsky's ownership and control would be concealed from U.S. authorities. Horsky provided the Relationship Manager with account opening forms where he identified himself as an Israeli citizen residing in Israel and provided a copy of his Israeli passport. The Relationship Manager was aware that Horsky resided in the U.S. as the Relationship Manager sent credit cards and checks linked to Horsky's accounts to his residence in the U.S. – the same address used on the account opening forms for the White Account. In an email, Horsky requested that the relationship manager issue the checks linked to the Black Account without the CS logo in order to conceal that the account was custodied in Switzerland.

### iv. Efforts to Conceal

Horsky took additional efforts to conceal from U.S. authorities his use of funds in the Horsky Holdings and Black accounts. For example, a relationship manager at International Bank noted that Horsky had given an instruction that transfers from the accounts he controlled to at

---

[4] Two years prior, Horsky had granted signature authority over the Horsky Holdings account to Person A and another relative but expressly conditioned that those two individuals could not exercise any control without his express permission. Horsky's relationship manager at International Bank was aware of this arrangement.
[5] Indeed, one employee wrote in an email to Person A that International Bank knew "nothing" about Person C.

5

International Bank to accounts that he controlled in another country be routed through a different Swiss bank and sent in a currency other than U.S. dollars "because of secrecy issues." Further, when a relationship manager at International Bank provided Horsky with a credit card linked to the Black Account, Horsky assured the relationship manager that he would use it outside the United States. Horsky understood that he should use it only in Europe so as to ensure that U.S. authorities would not have access to transactional data that would link him to the undeclared accounts in Switzerland.

Although Person C formally replaced Horsky as the beneficial owner of the Horsky Holdings and S.Y. accounts, Horsky solely exercised dominion and control over those accounts, and other accounts linked to it, for his own benefit. For example, Horsky sent dozens of instructions to International Bank ordering the transfer of funds from his accounts to art galleries and auction houses throughout the world in order to purchase fine art and have it shipped to his home in the United States.

### v.    Horsky Files a False Return for 2008

Finally, in early 2009, Horsky retained an accountant to prepare his 2008 U.S. Individual Income Tax Return. Horsky only informed the accountant about the assets that he had repatriated from the White Account. As a result, he reported and paid tax on only the gain from the stock that he transferred to the White Account. Horsky never reported over $40 million of income that he earned from the assets in the Horsky Holdings account.

### 3.    Horsky Uses Person A to Control the Horsky Holdings Account

Starting in 2012, certain International Bank employees initiated efforts to remove Horsky from formal control of the Horsky Holdings and S.Y. Management accounts and to close his Black Account. At that time, International Bank was closing accounts owned or controlled by

U.S. persons because the bank was under criminal investigation for aiding and assisting U.S. taxpayers in concealing assets and income from the IRS. At that point, Horsky could have closed the accounts at International Bank, brought the assets to the United States, admitted his conduct by entering the IRS's voluntary disclosure program, and paid the taxes, penalties and interest. Instead, with the assistance of employees at International Bank, Horsky went deeper into the shadows to conceal his ownership of his foreign financial accounts from U.S. authorities.

Horsky and International Bank employees agreed that the assets would remain at International Bank but that Person A, who was living in Zurich and had his/her own personal accounts with International Bank, would serve as the director of each entity and that he/she would be the sole person to exercise signatory over the entity accounts. In August 2012, Person A formally took control of the Horsky Holdings account. Person A submitted to International Bank a copy of a United Kingdom passport that stated a place of birth as "ROCHESTER USA." Horsky continued to communicate with International Bank employees regarding the account and retained effective control over the Horsky Holdings and S.Y. Management account by acting directly and indirectly through Person A.

### 4. Horsky Files False FBARs to Conceal his Accounts

Although Horsky had an obligation to report his ownership and control of foreign financial account to the Department of Treasury for calendar years 2000 through 2011, Horsky filed his first Report of Foreign Bank Account and Financial Accounts (for calendar year 2012) in August 2013.[6] As with his returns, Horsky filed a false and fraudulent FBAR on which he stated that he owned only two accounts in Israel that had an aggregate value less than $20,000. The FBARS omitted all the accounts that Horsky owned and controlled at International Bank

---

[6] The Bank Secrecy Act requires a United States resident or citizen with a financial interest in or signature authority over a foreign financial account to report the account yearly to the Department of Treasury by filing a, Report of Foreign Bank and Financial Accounts. 31 U.S.C. § 5314; 31 C.F.R. § 1010.350.

which, on December 31, 2012 had an aggregate value in excess of $168 million. By filing the FBAR, Horsky in essence was hiding in plain sight.[7]

### 5. Person A Expatriates and Renounces U.S. Citizenship

In 2013, International Bank employees aided and assisted Person A in locating a U.S. attorney practicing in Switzerland to assist Person A in renouncing his/her U.S. citizenship. The employees assisted Person A in order to ensure that the assets in the Horsky Holdings account remained at International Bank. As part of the renunciation, Person A submitted a false annual and expatriation statement to the IRS, Form 8854, which failed to disclose Person A's net worth and ownership of foreign assets, including land and a home that Person A purchased with funds gifted by the defendant.

### 6. Horsky Continues to File False Returns

For tax years 2000 through 2014, Dan Horsky filed false federal and state income tax returns that failed to report his ownership of the accounts at International Bank and other foreign financial institutions and the income earned from the assets held in those accounts. Indeed, he filed his 2014 return on April 14, 2015. On that return, Horsky underreported his income by $3.7 million and evaded tax of over $1 million.

### 7. The Scheme Ends

Nine days later after he filed his 2014 federal income tax return, on April 23, 2015, Special Agents arrived at Horsky's home in Rochester, New York and served him with a subpoena that required him to produce all records related to his foreign financial accounts. The subpoena identified the Horsky Holdings account by name and number and the Black Account

---

[7] On June 26, 2014, Horsky filed an FBAR for calendar year 2013. The FBAR was false and fraudulent as he reported ownership of two accounts in Israel with an aggregate value of $35,000. At the close of 2013, Horsky's undeclared accounts at International Bank and other foreign financial institutions swelled to an aggregate value in excess of $185 million.

8

by its number.  The defendant began plea negotiations with the government two weeks later and subsequently signed a plea agreement admitting his guilt seven weeks after that.

    **B.**    **Tax Loss**

In the plea agreement, the parties agreed that the base offense level would "be calculated on a tax loss of not less than $10 million."  Plea Agreement, ¶4(a), p. 3, No. 12.  The tax loss, including relevant conduct, amounts to $18,479,530.

The tax loss is "the total amount of loss that was the object of the offense (i.e., the loss that would have resulted had the offense been successfully completed)."  USSG §2T1.1(c)(1).  In determining the base offense level, a court must include all relevant conduct.  USSG §1B1.3(a).  Here, the tax loss is comprised of three components:  federal income tax; federal gift tax; and state income tax.  The court may include state tax losses in the tax loss computation, if the state tax loss constitutes relevant conduct under Section 1B1.3.  United States v. Baucom, 486 F.3d 822, 829 (4th Cir. 2007), vacated on other grounds, Davis v. United States, 552 U.S. 1092 (2008).

    **1.**    **Federal Income Tax**

The federal income tax is the crux of the offense.  Consistent with the obligations detailed in the plea agreement, Horsky has prepared and filed Amended U.S. Income Tax Returns, Forms 1040X, for tax years 2008 through 2014 that include the income he failed to report and the tax he evaded.[8]  Over those eight years, Horsky evaded $12.4 million in federal tax on over $69 million

---

[8] In anticipation of the entry of a restitution order, Horsky mailed checks to pay the federal income and tax and interest to the IRS's Service Center in Kansas City.  That office specifically handles restitution payments.

15007375.1

of income. The adjusted gross income ("AGI") reported on the original returns, the unreported income and the additional tax due and owing are as follows:

| Tax Year | Original AGI | Unreported Income | Additional Tax Due and Owing |
|---|---|---|---|
| 2008 | $7,247,861 | $40,318,143 | $6,110,111 |
| 2009 | $283,756 | $302,847 | $86,474 |
| 2010 | $266,955 | $11,931,499 | $2,154,133 |
| 2011 | $276,043 | $6,052,201 | $1,083,525 |
| 2012 | $906,435 | ($189,471) | $29,723 |
| 2013 | $265,794 | $6,938,073 | $1,761,015 |
| 2014 | $274,006 | $3,765,223 | $1,078,680 |
| **Total:** | **$9,520,850** | **$69,118,515** | **$12,303,661** |

### 2. Federal Gift Tax

Horsky used the income he reaped from his investments and evasion scheme to make substantial gifts to relatives, including Person A. In general, gifts are taxable to the donor, subject to certain exclusions, and a return must be filed. The evasion of the gift tax is relevant conduct as reporting the gifts could have led to discovery of the defendant's undeclared foreign financial accounts. Horsky has filed Forms 709, United States Gift (and Generation-Skipping Transfer) Tax Return, for tax years 20011 through 2014. The unreported gifts amounted to $7,343,478 yielding a tax due and owing of $868,221 ($426,396 for 2013 and $374,995 for 2014).

### 3. State Income Tax

Horsky resided in New York State during the years in question. He filed false and fraudulent state income tax returns that omitted the income he earned from the assets in the foreign financial accounts. As Horsky omitted the same income from his federal income tax returns as his state returns, the state tax loss should be considered relevant conduct. Horsky has filed Amended Resident Income Tax Returns, Form IT-201-X, with the New York State

Department of Taxation and Finance that include the income he failed to report and the tax he evaded. The tax due and owing to New York State is as follows:

| Tax Year | Additional Tax Due and Owing |
|---|---|
| 2008 | $2,761,793 |
| 2009 | $31,818 |
| 2010 | $1,075,162 |
| 2011 | $546,670 |
| 2012 | $0 |
| 2013 | $617,556 |
| 2014 | $337,868 |
| **Total:** | **$5,370,867** |

**II.     Sentencing Argument**

Although the Supreme Court rendered the federal Sentencing Guidelines advisory in United States v. Booker, 543 U.S. 220 (2005), "a sentencing court is still required to 'consult [the] Guidelines and take them into account when sentencing.'" United States v. Clark, 434 F.3d 684, 685 (4th Cir. 2006) (quoting Booker, 543 U.S. at 264). The Supreme Court has directed district courts to "begin all sentencing proceedings by correctly calculating the applicable Guidelines range." Gall v. United States, 552 U.S. 38, 49 (2007). The sentencing court, however, "may not presume that the Guidelines range is reasonable." Nelson v. United States, 555 U.S. 350, 352 (2009). The "Guidelines should be the starting point and the initial benchmark," but the sentencing court must also "consider all of the § 3553(a) factors" in determining the appropriate sentence. Id.; see also Clark, 434 F.3d at 685. Ultimately, the sentence imposed must meet a standard of reasonableness. See Booker, 543 U.S. at 260-61.

**A. Guidelines Range**

The government agrees that the Guidelines have been properly calculated as set forth in the Presentence Investigation Report and hereby moves for an additional one level decrease in

11

the defendant's offense level pursuant to U.S.S.G. §3E1.1(b). This results in a total offense level of 25; with a criminal history category of I, the advisory range is 57 to 71 months of imprisonment. The Guidelines fine range is $20,000 to $200,000, with a statutory maximum of $250,000.

    B. Section 3553(a) Factors

        1. **Nature and Circumstances of the Offense, History and Characteristics of the Defendant, and the Need for Just Punishment**

Tax evasion is a serious crime, and the use of offshore accounts by U.S. taxpayers to evade their income tax obligations has been a chronic problem. In April 2016, the IRS estimated that for the years 2008-2010, the U.S. tax gap, which represented the total amount of U.S. taxes owed but not paid on time, was $458 billion, despite an overall tax compliance rate among American taxpayers of 81.7%.[9] The IRS found that these updated "estimates suggest that compliance is substantially unchanged since last estimated for [tax year] 2006."

For over 15 years, the defendant utilized virtually every tool at his disposal to conceal assets offshore and access them through secretive means. Among other things, he relied on the established tradition of Swiss bank secrecy to hide his investments. He also established accounts in the names of nominee entities, which were based in Caribbean tax-haven countries, to add a further layer of concealment. He used the identities of nominees to formally "own" his assets, though Horsky maintained actual control. Horsky used his Israeli and U.S. passports to open separate personal accounts at International Bank, which were referred to as "declared" and "undeclared" in correspondence with International Bank personnel. Horsky also received credit cards from International Bank, which did not contain the International Bank logos, but which were linked to his accounts, which allowed him to access the funds without disclosing their

---

[9] See "Tax Gap Estimates for Tax Years 2008–2010," report by the IRS, available at: https://www.irs.gov/PUP/newsroom/tax%20gap%20estimates%20for%202008%20through%202010.pdf.

source. Further, Horsky ceased his scheme only once he was caught. Finally, the size of the assets involved, the duration of the scheme, and intricacy of the conduct involved make it different and apart from any other prosecution to date involving undeclared foreign financial accounts

### 2. The Need for Deterrence

Over the past 10 years, the government has engaged in a broad effort to crack down on U.S, taxpayers exploiting foreign financial accounts to evade taxes. The Department of Justice has prosecuted scores of U.S. taxpayers who engaged in such criminal conduct as well as the banks that held the accounts and the individuals, such as asset managers and fiduciaries, who assisted the U.S. taxpayers in concealing their money from assessment and collection of taxes. Further, more than 54,000 taxpayers have availed themselves of the IRS's offshore disclosure programs to disclose their foreign financial accounts. The IRS has collected over $8 billion from those taxpayers.

But the fight is not over. U.S. taxpayers continue to evade their taxes by concealing their assets and income offshore. The foreign banks and institutions are more likely to aid and assist ultra-high-net-worth individuals, like the defendant, to evade their taxes. Further, tax prosecutions such as this one require the government to commit significant investigative and prosecutorial resources, and the criminal conduct is typically only detected well after the offenses have been committed. A sentence of incarceration and a strong message of general deterrence in this case are necessary to ensure that U.S. taxpayers refrain from the use of tax havens to evade their taxes. Further, an even stronger message will be sent to individuals who make their living by aiding and assisting U.S. taxpayers in evading their taxes, be they fiduciaries, bankers or attorneys. These individuals will know that even though they may operate

offshore, there are severe consequences for aiding and assisting U.S. taxpayers in evading their taxes.

The government concedes that the defendant has paid a considerable amount to resolve this matter, and deserves credit for making those payments in advance of sentencing.[10] But the defendant would have had to pay those same amounts whether he had been subject to civil audit or prosecuted for a crime. While the numbers are quite large, they reflect the enormous scope of the crime Horsky committed. By any terms, even after making those payments, the defendant possesses extraordinary wealth. A sentence of incarceration is necessary in order to dispel any indication that one's freedom can be purchased by paying the government the money it was owed.

### 3. Fine

The Guidelines instruct that "[t]he court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. §5E1(a). The Presentence Report states that Horsky's assets exceeded $87 million (though the government presumes that the assets were depleted to some extent in order to pay the taxes and interest) and that his monthly income from his pension and Social Security benefits, exclusive of investment income, exceeds his expenses by $1850. Presentence Investigation Report, ¶¶ 44, 45, No 17. Given the defendant's assets and income, the government recommends that the Court impose a fine.

---

[10] Up to the date of sentencing, the defendant will have paid $124,505,305 to federal and state authorities, including: a $100,000,000 FBAR penalty; $12,303,661 in federal income taxes; $2,735,918 in interest on the unpaid income taxes; federal gift taxes of $801,391; $66,830 in interest on the unpaid gift taxes; $5,370,867 in state income tax; and $3,228,763 in interest on those taxes. Further, as the defendant has agreed not to oppose imposition of the fraud penalty for the federal income taxes that he evaded, he likely will pay an additional $9,227,746 to the IRS.

**III.    Restitution**

Pursuant to 18 U.S.C. § 3663A, restitution is mandatory in this case, and the parties have agreed that the defendant should pay full restitution to the IRS.  The government respectfully requests that the Court order restitution to the IRS for the following years in the following amounts:

**A.    U.S. Individual Income Tax**

| YEAR | AMOUNT |
|---|---|
| 2008 | $6,110,111 |
| 2009 | $86,474 |
| 2010 | $2,154,133 |
| 2011 | $1,083,525 |
| 2012 | $29,723 |
| 2013 | $1,761,015 |
| 2014 | $1,078,680 |

**B.    Federal Gift Tax**

| YEAR | AMOUNT |
|---|---|
| 2013 | $426,396 |
| 2014 | $374,995 |

**IV. Conclusion**

Based on the foregoing, and for the reasons stated in the United States' sealed filing, the United States submits that a final sentence should be imposed of twenty (20) months of imprisonment and three (3) years of supervised release, a fine within the Court's discretion, and a $100.00 special assessment.

Respectfully submitted,

Dana J. Boente
United States Attorney

By:       /s/
Mark D. Lytle
Assistant United States Attorney
Eastern District of Virginia
Counsel for the United States of America
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel.: (703) 299-3700
Fax: (703) 299-3981
Email: Mark.Lytle@usdoj.gov

By:       /s/
Mark F. Daly
Special Assistant United States Attorney
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel.: (202) 616-2245 (phone)
Fax: (202) 616-1786 (fax)
E-mail: Mark.F.Daly@usdoj.gov

Robert J. Boudreau
Special Assistant United States Attorney
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel.: (202) 616-3336 (phone)
Fax: (202) 514-0962 (fax)
E-mail: Robert.J.Boudreau@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on the 3rd day of February, 2017, I electronically filed the foregoing Position of the United States With Respect to Sentencing with the Clerk of Court using the CM/ECF system which will send notification of such filing to all attorneys of record.

A copy has also been sent via email to:

        Nina S. Blanchard
        Senior United States Probation Officer
        Nina_Blanchard@vaep.uscourts.gov

                      /s/
                      Mark D. Lytle
                      Assistant United States Attorney

15007375.1