# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA

———————————————————

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 1:16-cr-00224-TSE-1 |
| | ) | |
| DAN HORSKY, | ) | Sentencing: February 10, 2017, 9:00 a.m. |
| | ) | |
| Defendant. | ) | |

———————————————————

## DEFENDANT'S SENTENCING MEMORANDUM
## IN SUPPORT OF A SENTENCE OF PROBATION
## WITH SPECIAL CONDITIONS

MATTHEW C. HICKS
Virginia Bar Number 48377

MARK E. MATTHEWS

CAPLIN & DRYSDALE, CHTD.
One Thomas Circle, N.W., Suite 1100
Washington, D.C. 20005
Telephone: (202) 862-7852
Facsimile: (202) 429-3301
E-Mail: mhicks@capdale.com

SETH KOSSMAN
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC
100 Light Street, 19th Floor
Baltimore, MD 21202
Telephone: (410) 862-1095
Facsimile: (443) 263-4198
E-Mail: skossman@bakerdonelson.com

*Attorneys for Defendant Dan Horsky*

# TABLE OF CONTENTS

RELEVANT FACTUAL BACKGROUND ............................................................................. 2

I.     Personal Life ............................................................................................... 2

II.    Academic Life .............................................................................................. 6

III.   The Offense Conduct .................................................................................. 10

IV.   Financial Penalties ..................................................................................... 15

ARGUMENT ................................................................................................................... 15

I.     The Nature of the Offense & the History and Characteristics
of the Defendant ......................................................................................... 17

     a.    The Nature of the Offense ................................................................. 17

     b.    The History and Characteristics of the Defendant .......................... 17

          (i)    No history of criminal activity ............................................. 18

          (ii)   An academic with a successful career, contributing to
his academic discipline, the University of Rochester,
and the education of his students and colleagues ................ 18

          (iii)  Cooperation .......................................................................... 19

          (iv)  Personal acts of charity/care for family members and
friends .................................................................................. 19

II.    The Purpose of Sentencing ........................................................................ 20

III.   The Kinds of Sentences Available .............................................................. 22

     a.    A Sentence of Probation With a Special Condition of
Community Service Is Appropriate .................................................. 22

     b.    Support for Community Service Sanctions ....................................... 23

IV.   The Sentencing Guidelines ........................................................................ 25

V.    Pertinent Policy Statements ....................................................................... 26

VI.   The Need to Avoid Unwarranted Disparities Among Similar
Offenders .................................................................................................... 26

VII.  The Need to Provide Restitution to Any Victims of the Offense ............... 30

VIII. A Sentence of Probation with Special Conditions is Appropriate ............. 30

CONCLUSION ................................................................................................................ 31

Defendant Dan Horsky comes before the Court for sentencing after having pled guilty to a single count of conspiracy to violate the tax laws in violation of 18 U.S.C. § 371. Mr. Horsky has complied with all of the terms of the plea agreement, including payment of a $100,000,000 Foreign Bank Account Report ("FBAR") penalty and approximately $25,000,000 in back federal and state taxes and interest, having filed amended federal returns for 2008-2014 and FBAR forms for 2000-2014. Mr. Horsky submits the following sentencing memorandum to assist the Court in determining an appropriate sentence pursuant to 18 U.S.C. § 3553(a).[1]

The parties agree, subject to the Court's approval, that Mr. Horsky's offense level, before applying any reductions for acceptance of responsibility, is twenty-eight (28). We submit that a three-level reduction for acceptance of responsibility is appropriate, two by application of the guidelines and then one if the Court grants the government's anticipated motion pursuant to U.S.S.G. §3E1.1(b). If the Court agrees with the parties' computations, Mr. Horsky's adjusted base offense level will be 28, and with his acceptance of responsibility, his total offense level will be 25, resulting in an advisory Guideline range of 57-71 months (Criminal History Category I). *See* Presentence Investigation Report ("PSR") ¶ 50. However, the advisory Guideline range is but one factor to be considered in determining a sentence that is "sufficient, but not greater than necessary." *See Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (*quoting* § 3553(a)).

When all factors in this case are considered—including: (i) the defendant's extraordinary acceptance of responsibility reflected in his very significant financial payments, penalties and restitution, making the IRS and New York State whole;[2] (ii) his extraordinary cooperation over almost two years with the government, detailed in sealed filings by both the Department of

---

[1] A separate memorandum was filed February 3, 2017, under seal, concerning Mr. Horsky's substantial assistance to the government.

[2] In addition, a payment was made to Israeli tax authorities by Horsky family members on a portion of these same funds.

Justice and the defendant; (iii) his otherwise exemplary life of academic excellence, leadership and 40-year career of mentoring hundreds of students; and (iv) the sentences being imposed by the majority of courts on similarly situated defendants—we respectfully submit that a sentence of probation with special conditions of community service satisfies all the objectives of sentencing.

<b><u>RELEVANT FACTUAL BACKGROUND</u></b>

I.      **Personal Life**

Dan Horsky is an accomplished academic, viewed in the highest regard by colleagues, students and fellow researchers, both domestically and abroad.  He has made a significant contribution not only to his particular field of study but to the Simon Business School at University of Rochester.  In fact, he is regarded as one of the leading scholars in the field of quantitative marketing, and due to the known academic integrity and unbiased analysis of his work, portions of his research have become required reading in many university programs.[3]

By way of background, Mr. Horsky was born in 1945 in the United Kingdom to parents of Czechoslovakian citizenship.  His parents met in Prague, Czechoslovakia, and made a successful life for themselves there.  They left their home in 1939 when the Germans invaded Czechoslovakia; they were forced to leave all their possessions behind.  His parents first moved to Paris, where his father joined the British army as an officer.  With the fall of France, his parents and three-month old sibling were evacuated with the British army at Dunkirk.  They then settled in England during World War II, at which time Dan was born.  His father, Bedrick Horsky, was part of the invasion of Europe to push back the Germans.

Shortly after World War II and once his father's military service had ended, the Horsky family moved back to Czechoslovakia.  His family learned that even though they survived the

---

[3] An abbreviated curriculum vitae for Mr. Horsky is attached as Exhibit A.

Holocaust, large parts of the family including grandparents and an aunt were killed. Dan's father once again established himself as a successful businessman. However, harsh economic conditions and political repression from the Communists took over the country, the Horsky family moved again, this time to Israel, leaving everything behind again. As Jews fleeing wartime events, Dan's family members were automatically made Israeli citizens.

By this time, the Horsky family had fled Czechoslovakia twice and lost everything twice—once to the Germans and then to the Communists. This was a very tumultuous and chaotic life for the family, having been forced to move their home several times over the short period and each time to start their lives over in a new country.

Although Dan's father had graduate degrees and had been a very successful senior business executive, following the move to Israel, his family settled on a Kibbutz to find basic shelter. On the Kibbutz, Dan's father became essentially a laborer and performed other communal tasks. For the next seven years, he did whatever was needed for his family. His parents left the Kibbutz and moved to a suburb of Tel Aviv.

All of these events likely contributed to his father's struggle with depression. Dan's father was institutionalized for a period in Israel. As part of his therapy, it was suggested that he move to a new position in Jerusalem, while the rest of the family remained in Tel Aviv. Dan's mother, to shield him from his father's condition, sent Dan to Cambridge, England, for a year to stay with family friends and attend high school. His father eventually regained employment as a professional manager, and his mother became an English teacher.

Dan attended school in Israel and after graduating from high school joined the Israeli equivalent of the ROTC. Dan attended Technion Israel Institute of Technology where he obtained both his bachelor's and master's degrees in engineering. Dan served as an infantry

officer in the 1967 Six-Day War and later served in the Israeli Air Force, rising to the rank of captain. While in the Air Force, he received his M.Sc. in Operations Research. He wrote his thesis, "An Algorithm for Optimal Scheduling of Flights and Maintenance of Aircraft," using his academic skills to solve a real air force problem. Although Dan was located in the United States, he was dispatched as a reserves officer to liaison with the U.S. military in training during the 1973 Yom Kippur War to coordinate the new weaponry to be supplied to the Israeli Air Force.

Immediately following his release from active duty in the Israeli Air Force, Dan relocated to the United States and enrolled in the PhD program at Purdue University. Dan was drawn to the emerging quantitative marketing discipline, in particular due to its concentration on mathematical, economical and statistical aspects. After graduating from Purdue, Dan accepted a position at the University of Rochester as an assistant professor. Dan's talents were noticed by the Dean and his peers and he quickly moved up the ranks, eventually achieving the highest possible academic rank by becoming a full-time tenured chaired professor.

Dan married Batia Kaliski in 1969 and they had two children—a daughter in 1970 and a son in 1976. Dan's children were raised for significant periods in the United States, although both have resided abroad at various times. The family moved back to Israel from 1980 to 1982 for Dan's temporary job at the University of Tel Aviv. After problems developed in the marriage, a divorce ensued and Dan's former wife eventually left Israel and went to live in Singapore and then the U.S. Dan had to assume greater responsibility for the children who remained with him for times in both Israel and Rochester. Many letter writers commented on Dan's dedication to his children and his extended family. For instance, Kobi Shemer, a friend wrote:

> Danny was an exemplary dedicated father to his children, and I witnessed that
> first-hand since his son was my son's best friend…. Danny played a much more

involved role than fathers traditionally did in the 70's-80's, leading him at times to serve both as a father and a mother for his two young children. I was very impressed by his caring, loving, patient and dedicated relationship with his children.[4]

Several other friends as well as university colleagues commented on this bond between Dan and his children. Fellow professor Sanjog Misra wrote:

While I have only a limited view into Dan's personal life, I have always been impressed by his dedication and love for his children. He is a devoted father who is deeply involved in … (his son and daughter) lives and I have seen first hand his parenting and will admit that I try to model my own after his (albeit with limited success).

Even when both children were faced with life threatening medical issues (melanoma and a brain tumor), Dan was the only one there at their side, effectively a single parent, with a full-time career. Moreover, as Dan's former mother-in-law grew elderly, her need for assistance increased. Dan took it upon himself, at his own expense, to look after her wellbeing and made sure her needs were being met.

As described in the letters, as a young man Dan travelled extensively around the world to find what remained of his extended family after the horrors of the Holocaust. He identified relatives in many countries. Bea Watson who lives in Portland, Oregon, wrote the Court about Dan and his assistance to a close friend of hers—Otto Schiller. She describes Mr. Schiller "as a Holocaust survivor who lost his entire family in the Nazi death camps" and whom she met in Portland. She says that she met Dan nearly four decades ago when Dan called her explaining that he was looking for remnants of his family and that he had identified Otto as a distant cousin. Dan traveled to Portland to meet Otto. Ms. Watson describes some of the interactions this way:

Dan immediately came out to Oregon to meet Otto. Otto later shared with me that he now had family and he was no longer haunted by the belief that he had lost everyone. Dan was gentle and compassionate with Otto and he honored Otto with a respect that is rarely shown to older adults. Dan told me that if Otto ever needed

---

[4] All letters quoted in this memorandum are included with the Presentence Investigation Report.

anything to let him know and he would be there for him. A few years later Otto fell ill and I called Dan to let him know. He broke away from his busy schedule and came out right away. This was repeated several times through the years. The change in Otto as a result of Dan's search and commitment was transformative. I recall a time when Dan brought his children with him to meet Otto. I recall how tender and loving Dan was with his children and how he wanted them to know Otto was important to them.

As described in the PSR at ¶¶ 37-38, other family medical matters required much of Dan's time and attention. The need to deal with these family matters, often in person in Israel, is why Dan organized his professional life to be able to spend as much time in Israel as possible. Two years ago, he transitioned to part-time status so he could spend even more time in Israel both caring for his relatives and seeing his children and grandchildren.

## II.    Academic Life

These family difficulties and commitments did not prevent Dan from achieving significant academic and professional success. After receiving his PhD, Dan was first employed at the Simon School of the University of Rochester in 1974 as a junior professor, in his chosen discipline—marketing science. At this point, relatively few scholars were in this discipline world wide, and it was not the premier program it eventually became at Simon.

As letters forwarded to the Court attest, Dan had a stellar academic record and played a key role in building the marketing science program at the University of Rochester, especially in developing the faculty and young scholars.

As a scholar, Dan is an academic of international fame, as attested to by several of the character reference letters. In particular, Russ Winer, a chaired professor at NYU stated:

Dan has outstanding academic and personal reputations in the field of marketing. He is well known for his high level of scholarship and personal integrity. He is one of the top marketing scientists in the world among academics who apply quantitative methods to solving marketing problems.

Sanjog Misra a chaired professor at Chicago notes:

> He is a pioneer in incorporating micro-economic foundations into business models and using data ….to illuminate what is otherwise thought of as a subjective academic discipline. Dan's list of awards for his papers is long and compares favorably to the leading researchers in our field including those at leading schools such as Chicago, Stanford and MIT. What is striking about Dan's work is his keen focus on originality rather than using others works as a stepping-stone.

The respect for Dan's research achievements is further attested by the offers he received over the years including chaired professorships at Berkeley (see Russ Winer) and Subrata Sen of Yale: "I have tried to hire Dan at Yale but was not successful because he was very loyal to Rochester."

Dan's worldwide reputation helped attract both promising students and an excellent faculty, which significantly increased the visibility and reputation of the University of Rochester. Paul Nelson, a clinical professor at the Simon School of Business wrote that Dan "essentially built the Marketing Department at Simon from scratch…into one of the top quantitative economics-based marketing departments in the world." In addition, the Dean of the Simon School of Business said about Dan:

> He is a truly selfless scholar in a very deep sense. I feel fortunate to have benefitted personally from knowing Dan, and many of our faculty have also benefitted from having Dan as a colleague over the decades that he has worked selflessly to make the Simon school a center of academic excellence, filled with the best young minds in the field.

This sentiment is clearly echoed by Mark Zupan, the President of Alfred University and former Dean of the Simon School of Business. Mr. Zupan wrote that:

> Simon now routinely gets ranked as one of the top analytic-based marketing business schools in the country. Dan played a pivotal role in creating this success. The promising faculty that he attracted and mentored are playing leadership roles at Simon and/or have gone on to promising positions at other leading academic institutions around the world such as Yale, INSEAD, Chicago, and Vanderbilt.

For over 40 years, Dan spent a significant portion of his time mentoring young PhD students, in both professional and personal capacities, both while they were in school and beyond:

- Rajiv Dewan, a chaired professor at Rochester, wrote: "Dan has been an exemplary mentor for his doctoral students and master students.  He was very generous of his time and effort in helping doctoral students and colleagues. Many of them have gone to be successful academics at top business schools."

- Polykapros Pavlidis, a former student of Dan's and now a manager at a global marketing company, called Dan 'one of the most influential and supportive people I had around me while pursuing my PhD degree in the University of Rochester."  She noted that he was always encouraging and helpful, not only sharing his knowledge in the field with me but also offering moral support and confidence in my abilities to excel in research. In several cases when I faced hurdles in my research efforts Dan was able to help me transform challenges into learnings that strengthened me for the future.

- Tzachi Zach an Associate professor of accounting at Ohio State wrote: "There were several bumps in the road as I was progressing through the Ph.D. program.  I remember clearly several occasions where Dan was there for me during times of need."

- Wreetabrata Kar, an assistant professor at Purdue, noted, "Dan has been truly a friend, philosopher, and guide…..  Dan taught me the value of discipline, integrity, honesty, and most importantly compassion.  Even after graduation, he has been there for me whenever I am in crossroads.  I owe a lot of my success to him.  I take a lot of pride that I had a teacher like him to guide me at every step."

The university, recognizing Dan's contributions in this regard, named him University Mentor in 1986.

Dan's mentoring was not confined solely to University of Rochester students and faculty, but he also helped individuals from other universities in the U.S. and around the world. Colleagues who are senior chaired professors commented on this:

- Gary Lilien of Penn State wrote: "He is seen as a caring individual, someone who goes out of his way to help others, particularly students and more junior colleagues."

- Anne Coughlan of Northwestern noted: "Dan has consistently exhibited characteristics I admire, including integrity and responsibility, collegiality and mentoring, generosity in devoting his time to others, a strong commitment to academic community, academic excellence, and happiness and pride in his family."

- Itamar Simonson of Stanford wrote: "My impression is that, in his low key and modest way, he has always been happy to offer people in the field his advice and insights. Despite all his academic and institutional achievements, I have never seen the slightest sign of someone who is arrogant or is trying to promote himself at anyone else's expense. I have always seen a person who is truly nice, trying to help others.

- John Roberts, a chaired professor at Sydney, Australia recalls that Dan "is extremely generous with his time and constructive with his comments. He is very helpful not only to those at his home institutions of Tel Aviv and Rochester Universities, but to all members of our community."

Dan's good works transcend academics—he has had a significant personal impact on the lives of many individuals:

- Rafael Cohen stated about Dan: "He treated every person he met during our weekly meeting with dignity and respect and would never let anyone around him to feel inferior in any way, shape or form."

- Avi Seidmann writes about the aftermath of a personal tragedy: " I was heartbroken, devastated and lost my joy in life. I have had many friends in Rochester, but none of them came forward as I needed them to. …Yet although Dan and I had not been very close, he took me under his wing. He spent numerous hours trying to help me and not to lose hope, when darkness and despair surrounded me."

- Idan Marom writes: "To this day, my parents, my sister and me talk about Dan's noble actions and find it amazing that while dozens of friends and family members that owed my parents so much—did nothing to help us, and the only one that truly helped us—did not owe us a thing."

These examples are touching, but for Dan they are routine, as demonstrated by the numerous letters submitted to the Court, only a few of which are summarized here. We note that many of the letters or emails were sent to Dan upon his retirement, well before news of these charges was public and therefore were not solicited in connection with Dan's sentencing. We

also note that to minimize the potential negative publicity for his University, Dan resigned months before he pled guilty (and years before he had planned) so that he would be a retired professor and not formally associated with the University at the time this matter became public. Of his many regrets about the impact of his conduct—on his country and his family and friends—he has anguished over any negative impact on the institution to which he dedicated his career.

## III.     The Offense Conduct

In the early 1990s, Dan's academic interests were focused on entrepreneurs and new business products. This led him to spend an enormous amount of his time researching and evaluating internet start ups. As he became intimately familiar with many such companies, he began to invest in these startups. In the initial years of these investments, Dan was actually investing more of his father's and his sibling's lawfully earned funds. (Both Dan's father and sibling were not U.S. citizens and lived in Israel.) Dan also invested his own lawfully earned funds.

Dan's focus was on Israeli startups; Israel has a particularly active economy in such internet start ups. The early results were not promising. In fact, of the approximately 18 investments from this period, money was lost on all but one of them. Despite large losses, Dan continued his investing activities, in part, by the desire to recoup the earlier losses that he had created for both himself and his family. Dan began to resort to using cash advances from his credit cards and ultimately a second mortgage to fund additional start up investments.

One of the original startups that Dan had identified—referred to as "Company A" in the Information—was a British company in which Dan and his family were one of the initial investors, with just over $100,000. As with all start-ups this investment was at first not tradable

in any exchange.  By 2000, the shares in this investment were going to become tradable and Dan, therefore, needed a brokerage account to hold these shares.  He approached his local bank branch in Israel, but was told that Israeli banks were not able to hold this type of foreign share at that time.  Through his contacts, Dan learned of an Israeli lawyer who could assist in the opening of a brokerage account that could hold these shares and execute on anticipated future orders.  After meeting with the lawyer, Dan learned that the lawyer had a relationship with a Swiss bank and decided to open an account there.

Dan was not the first member of his family to open and use a Swiss bank account.  In fact, Dan's father had inherited funds from Dan's grandmother's Swiss account, and Dan was aware that his father had a Swiss bank account as well.  It is of course no excuse to any illegal tax avoidance, and Dan understood he was committing a crime and takes full responsibility for his actions, but it was not uncommon for families with significant Holocaust casualties and multiple expropriations to seek the security and, frankly, confidentiality of a Swiss bank account.

The lawyer advised Dan to form a corporation to open the Swiss account  and prepared the incorporation documents for Horsky Holdings.  This account was followed in subsequent years by two other accounts—SY and AS.  Dan identified his father as the nominal owner of Horsky Holdings, but was transparent with the Swiss bank  that he was a U.S. person and living in the United States.  Dan was the only family member who communicated instructions to the bank and he regularly emailed and faxed the bank employees with overwhelming numbers of references to his U.S. status and location.  Unlike most individuals with undisclosed accounts, Dan kept all of these communications in his Rochester townhouse in the United States, along with all bank records and transfer information.

By 2005, Dan had accumulated over $350,000 in debts from his investing activity. Although many people would have stopped, Dan remained confident in his strategy.

Dan continued to invest every asset he could into Company A, convinced its future prospects were strong. He used frequent margin loans from the Swiss bank in order to fund additional purchases of Company A stock. In the earlier years of these investments, there were no U.S. tax consequences due to the large losses incurred. But Dan failed to report these investments and accounts to the IRS and continued to conceal the accounts and the taxable gains later when they occurred.

Starting in 2005 the share value of Company A increased dramatically. Then in 2008, Company A was purchased by "Company B" in the Information, driving the value of the investment even higher. Following the sale, the Swiss bank accounts held approximately $80,000,000, representing Dan's and his sibling's share of the stock sale. At that point, Dan decided to use a substantial part of the funds from the sale to reinvest in Company B, and most of the remainder of the funds were left in the Swiss bank accounts.

Up until this point, Dan had not moved any of the money to the United States. However, after the purchase by Company B, Dan decided that he wanted to return enough funds to the U.S. to fund his retirement. He projected a retirement fund with a significant safety margin of $7 million, including adjustments for the federal and state taxes that needed to be paid on the funds coming into the U.S. Dan directed the Swiss Bank to open and fund a new account in his own name, not an entity name, with approximately $7 million and to wire it directly to his personal bank account in the United States. Dan informed his U.S. accountant of this income and reported and paid taxes on these funds on his 2008 U.S. tax return. Of course, he should have

paid taxes on his share of the entire capital gain from the sale of Company A, but he kept the remaining funds concealed in the entity accounts to avoid paying taxes on the full capital gain.[5]

Throughout this period and until this investigation began, Dan lived a relatively humble and simple life. He continued to live in the same townhouse that he bought in 1984 for approximately $70,000. He drove his Saab until it was 20 years old. He continued his regular teaching and mentoring schedule, and several colleagues noted his modest lifestyle. Dan's real passion, and only indulgence, was in the collection of art, in particular prints and tribal art. He had begun purchasing art in the mid-1980's, all with legally earned and taxed funds. Beginning in 2008 and continuing through 2014, Dan continued to purchase art, using both domestic funds and funds from the Swiss bank account.

Other than the above, Dan did not repatriate any of the other funds to the United States. He did make gifts to relatives, and has now filed and paid gift taxes on these sums. By 2014, those overseas financial assets were worth approximately $200 million, almost entirely of unsold Company B shares. Dan continued to conceal those assets, and he lived his modest life as a university professor.

As with many individuals having such unreported accounts, Dan did not know how to come back into compliance without disclosing his past activities. The Swiss bank never alerted him to the IRS disclosure program where he could have obtained a non-criminal, non-public civil resolution by paying large penalties. As of today, well over 55,000 people with unreported foreign accounts have entered the IRS disclosure programs where they have acknowledged

---

[5] All capital gains were correctly reported on the recently amended 2008 return and taxes paid with interest.

willful misconduct, reveal their offshore assets and returned to compliance without a criminal investigation. The IRS reports recoveries from these disclosures of $10 billion.[6]

In April 2015, Dan received a grand jury subpoena for records of his foreign accounts. Dan, fully understanding that he had engaged in wrongdoing, quickly decided not to resist this subpoena, spared the government the time and expense of a multi-year, multi-continent investigation, and directed his counsel to approach the Justice Department prosecutors to agree not only to plead guilty, but to offer an elaborate and complex cooperation plan.

For almost two years from mid-2015 to approximately February 2017, Dan cooperated with an extensive and complex government investigation, involving investigative activities on three continents. Given Dan's voluminous historical, financial, and communication records and his contacts within the financial community, Dan's cooperation provided extraordinary results for the government. This cooperation was directed to an area of longstanding DOJ and IRS investigative and prosecutive interests—foreign bank accounts and foreign bank officials facilitating U.S. tax evasion. The details of the cooperation are contained in a sealed memorandum.

On November 4, 2016, Dan pled guilty before this Court to one count of conspiracy to violate the tax laws. Pursuant to the plea agreement, he has filed amended tax returns and made full payments to the IRS in excess of $15,000,000 to reimburse for *federal* taxes and interest; NY State was a separate payment. In addition, in August 2016, even before he pled guilty, and as a partial expression of his extraordinary acceptance of responsibility and desire to make things right, Dan paid a $100,000,000 FBAR penalty as required as a condition of his guilty plea. To

---

[6] https://www.irs.gov/uac/newsroom/offshore-voluntary-compliance-efforts-top-10-billion-more-than-100000-taxpayers-come-back-into-compliance

the knowledge of counsel, this penalty is approximately double the highest previously imposed

FBAR penalty and one of the highest individual penalties ever imposed in a tax prosecution.

Dan fully understands the gravity of his crime and acknowledges his culpability in committing it. He knew it was unlawful to not report the existence of the accounts as well as to evade taxes on his share of the income from these accounts, and he accepts full responsibility for his conduct.

## IV.    Financial Penalties

Prior to sentencing, to summarize the payments above, Dan has paid a $100,000,000 FBAR penalty, $15,038,859 in federal taxes and interest, $8,599,630 in NY State taxes and interest, and $866,896 in federal gift taxes and interest.[7]

Dan's combined federal payments exceed the federal taxes actually due in the years at issue by a multiple of *eight* (8). Moreover, the *lowest guideline fine* in this case is $20,000, so the federal payments already made exceed that figure by *over five thousand* (5,000) times. It is also over *five* (5) times the *maximum guideline* fine of $20,000,000.

These payments reflect Dan's extraordinary acceptance of responsibility, and the public reporting of these enormous financial penalties have already created and will continue to generate a significant deterrence message. Indeed, the government apparently wished to emphasize the financial sanction in this case—with the penalties so many multiples in excess of taxes due and guidelines provisions—and we urge the Court to give significant weight to that.

## ARGUMENT

Since *Gall v. United States*, 552 U.S. 38, 50 (2007), Guideline ranges are no longer presumed reasonable; federal sentencing is based on individualized assessments; "extraordinary

---

[7] Because Dan's assets were held in securities and not cash, he has had to liquidate well over $100M in assets in order to make these payments and will of course pay additional millions of dollars in capital gains taxes this year.

circumstances" are no longer required to justify a sentence outside the Guidelines' advisory range; and rigid mathematical formulas to determine whether a variance from the Guidelines' sentence range is justified are discouraged. *Id.* at 47.

Accordingly, after calculating the proper offense level under the Guidelines and giving the government and the defense the opportunity to argue for the sentence they believe to be appropriate, district courts have "broad discretion to impose a non-guideline sentence by weighing the § 3553(a) factors" and tailoring a sentence to fit the circumstances of the case. *United States v. Booker,* 543 U.S. 220, 245 (2005); *United States v. Robertson*, 662 F.3d 871, 875 (7th Cir. 2011). The § 3553(a) factors include:

    (1)     the nature of the offense and history and characteristics of the defendant;
    (2)     the purpose of sentencing;
    (3)     the kinds of sentences available;
    (4)     the Sentencing Guidelines;
    (5)     the policy statements issued by the Sentencing Commission;
    (6)     the need to avoid unwarranted disparities among similar offenders; and
    (7)     the need to provide restitution to any victims of the offense.

This case exemplifies why the Supreme Court rejected mandatory and mechanical application of the Sentencing Guidelines and restored district courts' discretion "to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Pepper v. United States*, 131 S. Ct. 1229, 1239-40 (2011) (internal quotations and citations omitted). Cases often present unique, and at times unprecedented, facts and circumstances that sentencing courts consider with care and discretion in fashioning an appropriate sentence.

We submit that application of § 3553(a) factors to this case leads to the conclusion that a sentence of probation with special condition of community service is appropriate. This case is out of the heartland of criminal tax cases with similar guidelines ranges, and the § 3553(a)

factors illustrate why probation is a punishment "sufficient, but not greater than necessary, to comply with the statutory goals of sentencing." *Kimbrough*, 552 U.S. at 109.

I.     **The Nature of the Offense & the History and Characteristics of the Defendant**

     a.     *The Nature of the Offense*

     Dan stands by his plea; he acknowledges his guilt, and nothing in this section is intended to diminish the wrongfulness of what he did.  It was a knowing and willful violation of law occurring over many years and ultimately involving investment gains of $200 million.  The *behavior* Dan engaged in, however, was ultimately no different than the majority of the tens of thousands of taxpayers who entered one of the IRS amnesty programs, some with accounts larger than Dan's.  Of course Dan did not engage in a similar voluntary disclosure.  However, Dan's extraordinary efforts to cooperate with the government; the results of that cooperation to date; his voluntary and early payment of approximately $125 million in tax, interest, and penalties; and his full acceptance of responsibility are highly relevant to the nature of his offense.

     We respectfully also ask the Court to consider the family history and experience described above with the Holocaust, not as an excuse or defense, but rather to understand the circumstances of the individual before the Court.  The experience of these families was that people with money concealed in Switzerland were more likely to buy their way out and escape due to the fear that "it could happen again."  The failure to report such accounts is of course a crime, and there is no question that Dan evaded a large amount of tax.  But given this particular family history, one can at least attempt to explain, in part, why this happened here as the court considers the individual circumstances of the defendant.

     b.     *The History and Characteristics of the Defendant*

     There is no denying the seriousness of what he has done or that Dan compounded this error with each year's tax return and the repatriation and taxation of only a portion of his funds.

But Dan's history and character lead to one conclusion—the crime to which he pled guilty is an aberration in an otherwise law abiding life full of contributions to his family and community. One court aptly summarized the importance of the consideration of a defendant's history and characteristics as part of the analysis under § 3553(a):

> But, surely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is common to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, "the history and characteristics of the defendant."

*United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006), *aff'd* 301 F. App'x. 92 (2d Cir. 2008). Keeping these principles in mind, we urge the Court to consider the following indisputable facts, and what those facts say about Dan:

### (i)    No history of criminal activity

This is Dan's only criminal offense in his life. We submit that his conduct in this case amounts to a contained series of events constituting a single exception to an otherwise law-abiding life. *See id.*; *United States v. Suarez-Reyes*, No. 8:12CR67, 2012 U.S. WL 6597814, at *7 (D. Neb. Dec. 18, 2012); *United States v. Rowan*, No. 06-321, 2007 WL 127739, at *8 (E.D. Pa. Jan. 10, 2007) (imposing sentence of probation with home confinement for mail fraud conviction based on defendant's history and isolated nature of crime in that history).

### (ii)    An academic with a successful career, contributing to his academic discipline, the University of Rochester, and the education of his students and colleagues

As the many dozens of letters filed with the Court indicate, Dan has had a very successful academic career, in which over his four decades at the Simon School, he has had an enormously positive impact on the school, his chosen field of quantitative marketing and the careers, even the lives, of his friends and colleagues. The school now has one of the top programs in this field.

Even more than the school, however, those letters attest to Dan's impact on the lives of many young scholars—mentoring them and helping them advance their careers with assistance on academic papers or speaking positions at academic conferences. Many of the letters noted that Dan did not just focus on the superstars—who would need less help anyway—but on some of the young scholars who had yet to demonstrate their full academic promise.

(iii)    Cooperation

The extent and complexity of Dan's cooperation efforts are discussed at length in a sealed memorandum accompanying this filing.

(iv)    Personal acts of charity/care for family members and friends

Dan has always made it a priority of his to assist people in need. Family, friends, and colleagues knew that they could count on him for support. Again, this character trait was reflected time and time again in the letters provided to the Court. Koby Shemer, a longtime friend of the Horskys commented that "I was also able to witness Danny's relationship with his father and sister, and was deeply impressed with his close and most caring relationship with both of them. I was especially impressed by Danny's dedication to his father for many years." The PSR describes some of the confidential serious medical issues faced by Dan's family members that he has been attending to with great care for many years. Another letter forwarded to the Court by Avi Seidmann, a chaired professor at Rochester, attested to the fact that it wasn't only family members that Dan rendered assistance to, but friends as well. More importantly, he offered this assistance privately and without seeking notoriety, according to Professor Seidman: "I value those who give to charity or help others, but I value even more those who do it with no publicity-as Dan has been doing all along." Numerous other letters made this point and repeated specific, and detailed historical examples of Dan's generosity.

**II.     The Purpose of Sentencing**

Each sentence imposed under the Guidelines should be determined based on the relevant

facts and circumstances, and designed:

    (A)     to reflect the seriousness of the offense, to promote respect for the law,
            and to provide just punishment for the offense;
    (B)     to afford adequate deterrence to criminal conduct;
    (C)     to protect the public from further crimes of the defendant; and
    (D)     to provide the defendant with needed educational or vocational training,
            medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

We respectfully submit that in light of all of the circumstances in this case, an

incarcerative sentence here is not necessary in this case to "reflect the seriousness of the offense"

or "to promote respect for the law."  The indictment and collateral consequences, including the

enormous FBAR penalty and press accounts (national media and industry press)  about these

proceedings, already convey the seriousness of, and provide significant punishment for, this offense.

Moreover, Dan demonstrated early and complete acceptance of responsibility for his conduct,

confirming his remorse and his respect for the law, the government and this Court.  *See United

States v. Pauley*, 511 F.3d 468, 474 (downward variance of 36 months justified in part because

defendant was "deeply remorseful"); *United States v. Gardellini*, 545 F.3d 1089, 1091 (D.C. Cir.

2008) (downward variance to sentence of probation for I.R.C. § 7206(1) offense justified in part

because defendant "cooperated with authorities and accepted responsibility for his crimes");

*United States v. Howe*, 543 F.3d 128, 135-36 (3d Cir. 2008) (downward variance justified in part

because Judge believed defendant unequivocally accepted responsibility and was sincerely

remorseful.

Furthermore, there is no evidence showing that recidivism is a concern.  *See United

States v. Smith*, 275 F. App'x 184, 187 (4th Cir. 2008) (downward variance of 54 months was

justified in part because of a low risk of recidivism); *United States v. Roth*, No. 05 CR 792-5, 2008 WL 686783, \*1, 3 (N.D. Ill. Mar. 11, 2008) (departing from guidelines range of 63 to 78 months to probation on charge of making materially false statement to the FBI due, in part, to defendant's sincere remorse and absence of criminal history, all indicating no threat of recidivism). As detailed above, this case concerns an isolated series of events in Dan's otherwise law-abiding life, during which he has otherwise behaved as an exemplary citizen, making contributions to his community, his colleagues and family. There is no reason to believe prison time is necessary to prevent him from engaging in tax evasion again.

As to general deterrence, there have been numerous media (particularly tax industry press) and Internet references to Dan's guilty plea which repeat his enormous FBAR penalty and possible incarceration. His guilty plea has been a significant event in the government's nearly decade long pursuit of offshore tax evasion, sending not only a message to individuals potentially tempted to tax evasion, but a strong message to the banking and other professionals globally that aid and abet these crimes. The sealed cooperation memorandum provides more context for the deterrent effect of this prosecution. The government has more than achieved substantial general deterrence goals without Dan having to serve time in prison.

Finally, a term of incarceration is not required to provide Dan with "needed educational or vocational training, medical care, or other correctional treatment." In fact, as opposed to incarceration, as discussed below, a sentence of probation crafted with special conditions mandating Dan's contribution to particular charitable activities will actually yield a net positive societal benefit.

**III.    The Kinds of Sentences Available**

This Court has the authority and may exercise its discretion to consider a wide range of alternatives to the lengthy term of imprisonment that is called for under the Guidelines. 18 U.S.C. §§ 3553(a)(3) and 3561(a)(1). In fact, § 3553(a)(3) specifically directs consideration of sentences *other than* imprisonment.

   *a.    A Sentence of Probation With a Special Condition of Community Service Is Appropriate*

The Court may consider a sentence of probation with a special condition of community service. A probationary sentence here, which we recognize would be a substantial variance from a strict application of the guidelines, would be fully justified in this case on two grounds. First, as we will describe *infra* in Section VI concerning the avoidance of sentencing disparities, dozens of federal district courts have sentenced defendants to probation (often including a period of home confinement and/or community service) in offshore cases where the defendant engaged in similar, or even identical conduct as Dan. Second, a number of defendants have received sentences of probation after demonstrating characteristics and circumstances similar to a number of those present in this case. *E.g.*, *Howe*, 543 F.3d at 130-31 (affirming below guideline sentence of probation and home confinement on wire fraud convictions); *United States v. Moore*, 344 F. App'x. 767, 768-69 (3d Cir. 2009) (affirming sentence of probation and home detention on tax evasion conviction despite guideline range of 18 to 24 months based on defendant's lack of criminal history and cooperation with the government). These cases are merely illustrative of many others that have imposed sentences of probation with home confinement, including for the same crime Dan has pleaded guilty to, as detailed *infra*.

*b.*      *Support for Community Service Sanctions*

Based upon the information contained in this memorandum, and given the mandate of

§18 U.S.C. 3553(a)(3) for the Court to consider "the kinds of sentences available," a community

service order would satisfy the goals of sentencing. A 2005 publication of the Administrative

Office of the U.S. Courts described community service as "a flexible, personalized, and humane

sanction, a way for the offender to repay or restore the community. It is practical, cost-effective,

and fair—a 'win-win' proposition for everyone involved."[8] They recognize that "community

service addresses the traditional sentencing goals of punishment, reparation, restitution, and

rehabilitation….It restricts offenders' personal liberty…allows offenders to atone or 'make the

victim whole' in a constructive way…[and] may be regarded as…a form of symbolic restitution

when the community is the victim."[9]  In selecting an appropriate candidate to perform

community service, U.S. Probation and Pretrial Services recommends:

> ….Courts can use community service successfully with a wide spectrum of
> offenders: corporations and individuals, first offenders and recidivists, the
> indigent and the affluent, juveniles and senior citizens. Not every offender is a
> good candidate for community service…Courts look for offenders with personal
> and social stability, who are willing, motivated, and who have no history of
> violence.

Indeed, in April 2010, the United States Sentencing Commission submitted to Congress

proposed amendments, which went into effect November 1, 2010.[10]

Dan Horsky is an outstanding candidate for community service. He is a first-time

offender; he has no history of violence and he is highly motivated to continue aiding his

community as is evident from his past efforts in the academic community on behalf of budding

---

[8] *Court & Community: An Information Series About U.S. Probation & Pretrial Services: Community Service,* Office of Probation and Pretrial Services, Administrative Office of the U.S. Court, 2005.

[9] *Id.*

[10] *Amendments to the Sentencing Guidelines, Policy Statements, and Official Commentary* (April 30, 2010) http://www.ussc.gov. Retrieved 5/25/10.

scholars.  An appropriately structured community service for Dan could serve the needs of justice very effectively in this case, by taking his time and expertise and putting them to use in a constructive and useful manner.

The numerous letters submitted to the Court attest to Dan's longstanding excellent reputation in the academic community both in the United States and abroad.  Many of these letters were unprompted (sent to Dan at the time of his retirement), and they relate incidents of Dan's particular skills at mentoring young PhD candidates.  There was story after story of Dan mentoring, counseling and otherwise assisting these young academics.  Dan helped them identify topics for important academic papers, reviewed drafts of those papers for them, providing helpful comments and advice, helping to promote them in academic panels and publications and to other university programs.  The scope of Dan's assistance was to students in the United States and abroad.

We suggest that Dan's sentence could include probation with a special condition that he perform 500 hours of service to the academic community.  Dan believes that due to his global connections in this academic community, he can meet this hourly requirement and is prepared to travel and spend weeks at a time at other universities, mentoring students.  An order of community service such as this is not some newly developed suggestion of public service; rather Dan has a multi-decade track record of providing exactly this time of guidance to young scholars.  We most respectfully suggest that using Dan's demonstrated skills in this area is a far better resolution for the community than sentencing him to incarceration.[11]

In a major fraud case in the Eastern District of New York, Judge John Gleeson spoke to the value of community service and his struggle to impose such a sentence:

---

[11] Of course, if the Court determines that a sentence that includes some restriction on liberty is necessary to effectuate the purposes of sentencing, the Court could include a period of home confinement combined with the special condition of community service.

The prospect of a sentence that does not include incarceration, which is explicit in the papers submitted by your lawyers, is a daunting one for no other reason than it might fail to promote respect for the law which is one of the things a sentence must do for someone who participated so integrally in a fraud from, as far as your piece of it is concerned, cost financial institutions, what, $110 million.

\*\*\*\*\*\*

In fact, you know, one might say how could, no matter how essential you were to the prosecution of the more culpable participants in this crime, how do you justify an intelligent, accomplished businessman such as yourself committing this type of crime and not being sent to jail, not being, having the punishment include that type of condemnation, the most significant form of condemnation a sentencing judge in a financial crime can mete out?

But nothing should ever be out of bounds and I've struggled with your lawyer's request, struggled with it throughout the presentations I've heard here, and I conclude that a sentence that doesn't include incarceration is appropriate here. Alternatives to incarceration exist that can carry both the community and this Court's condemnation of your conduct but channel it in a way that's more constructive, given your significant charitable works and contributions before this case, given the extraordinary timing of your cooperation and its nature, given your age and your physical circumstances. I don't think the goals of sentencing here require you to be incarcerated.

I am placing you on probation for a period of five years. One special condition of probation would be that you be in home detention for a period of six months.

Another is that you perform 500 hours of community service. It strikes me that you can do some good in your community. You already have. It seems to me you deserve it. The combination of circumstances in your case makes you worthy of serving your punishment in a manner that a little more constructive than going to jail.[12]

## IV.    The Sentencing Guidelines

The defense acknowledges that the PSR correctly calculates the guideline range applicable to this case.  Additional comments on the guidelines are included in the discussion of sentencing disparity below.

---

[12] *United States of America v. David Shamilzadeh,* 04-CR-194 (JG), United States District Court, Eastern District of New York, April 1, 2008.

## V.    Pertinent Policy Statements

There are no pertinent U.S. Sentencing Commission policy statements.

## VI.    The Need to Avoid Unwarranted Disparities Among Similar Offenders

Dan's case is part of an aggressive nine-year IRS/DOJ program to pursue tax offenders who have used offshore accounts to conceal funds.  More than 130 individuals have been charged as a part of that program and approximately 78 have been sentenced as individuals where the utilization of an offshore account constituted the primary issue.[13]  These cases invariably involve significant tax loss and multi-million dollar foreign accounts.  Sentencing judges in these offshore cases have imposed sentences with downward variances in unusually high volumes—in over 98% of the cases—even where there is no 5K motion.  Even in the one exception defense counsel located, the defendant was prohibited from asking for a variance because he signed a binding plea agreement mandating a sentence at the bottom of the guideline range.  The variances in offshore cases are often substantial, averaging a reduction of over 85% from the bottom of the guideline range.[14]  The most common sentence, by far, has been probation, which has occurred in *59% of all cases*, in many instances with a combination of home confinement and/or community service.  In cases, such as this one, that involve the issuance of a 5K motion, periods of incarceration are even rarer, and variances are even more robust.  As has occurred in this case, these variances may reflect, in part, the high financial (FBAR) penalties imposed by the government, the over 55,000 individuals with similar conduct in voluntary disclosure programs, and the breadth of the defendant's cooperation (though we doubt any case presents cooperation as extensive or meaningful as this one).

---

[13] This does not include defendants who were bankers or other professionals.  The sentencing data in this section of the brief is derived primarily from DOJ website information, a private website that tracks offshore sentencings, data supplied by a sentencing consultant with access to the Sentencing Commission's databases and various court filings.

[14] One reason for the relatively high percentage variance is the number of cases where the ultimate sentence is probation, yielding a variance of 100%.

It is entirely appropriate for the Court to look to sentencing in similar cases and to note when those cases have consistently imposed sentences below the guidelines' range including sentences of probation. *United States v. Groos*, No. 06 CR 420, 2008 WL 5387852, at *7-8 (N.D. Ill. Dec. 16, 2008) (looking at other cases and sentencing defendant to 60 days imprisonment despite guideline range of 24 to 30 months); *see also United States v. Doan*, 498 F. Supp. 2d 816, 820 (E.D.Va. 2007) ("This Court does not dispute the value in looking nationwide to similarly situated criminal defendants of similar culpability that have committed similar acts resulting in similar convictions with similar backgrounds and with similar records under similar circumstances.").

The government will no doubt point to the concededly large size of Dan's account as a reason for the court to impose some incarceration, but that ignores several mitigating factors that we submit more than compensate for this fact. First, as was detailed *supra* and in the sealed filing, Dan provided the government with an extraordinary level of cooperation. Dan provided the government with voluminous historical documentation, going back decades, chronicling his involvement with foreign banks; participated in an active investigation; and undertook numerous debriefings with prosecutors, agents, and regulators. In the cases we have identified where a 5K motion was filed, sentences of probation are almost standard, occurring in 69% of all cases, and even when periods of incarceration are imposed in cases with 5K motions, they are often exceedingly short with 86% of sentences including 2 months of jail time or less. From our review of the cases in this area, no other defendant provided remotely the same level of cooperation as was present in this case. Many appear to be based on providing information in interviews and offers to testify if needed.

Second, Dan has made an extraordinary level of restitution to the treasury, paying a $100,000,000 FBAR penalty as a stipulation of his plea agreement. Sentencing guidelines in tax cases are connected to the size of the tax loss to the government, not the size of the account. The account size determines the FBAR penalty, and Courts have considered the magnitude of this penalty as additional punishment and a mitigating factor at sentencing. The clearest example of this can be found in the prosecution of Ty Warner in the Northern District of Illinois. Mr. Warner was prosecuted for an undisclosed offshore bank account that had a high balance of over $100,000,000. The Court imposed probation, primarily on Mr. Warner's charitable activities, but it also noted that he had already "been punished…severely" by paying the "largest fine in history." The Warner case involved no 5K motion.

As explained above, probationary sentences, such as in the Warner case, are common in the sentencing of offshore cases. For example:

- Andrew Silva, Eastern District of Virginia, Case No. 10-CR-00044, before Judge Liam O'Grady. Repatriated funds from his undisclosed offshore account by mailing himself 26 packages of currency and carrying another two packages into the United States, always structured in amounts under $10,000 to avoid detection. Sentenced to 2 years' probation, 4 months' home detention, and 100 hours of community service.

- Albert Cambata, Eastern District of Virginia, Case No. 15-CR-362, before Judge Claude M. Hilton. Received $12 million from a Belizean company which was deposited into an undisclosed account at a Swiss bank in the name of Hong Kong Corporate entity. Funds were later transferred to a Singapore and Monoco bank account and Cambata neglected to file FBARs or Forms 8938 even after he was advised to do so by counsel. Sentenced to 1 year probation and a $15,000 fine.

- Mary Estelle Curran, Southern District of Florida, Case No. 12-80206-CR-RYSKAMP. Owned an undisclosed $47 million Swiss bank account which resulted in a $21 million FBAR penalty. Sentenced to *five (5) seconds* of probation.

- Igor Olenicoff, Central District of California, Case No. 07-CR-227. Controlled and hid assets in undisclosed foreign accounts resulting in tax

liability to the IRS totaling $52 million. His offshore accounts contained approximately *$200 million dollar.* Sentenced to two years' probation.

- Juergen Homann, District of New Jersey, Case No. 09-CR-724. Placed $5 million in an offshore account with UBS resulting in a guideline range of 30 to 37 months. Court was impressed with Homann's cooperation in providing information on individuals not previously known to the government and granted a substantial downward departure, sentencing defendant to 5 years probation and 300 hours of community service.

- Ashvin Desai, Northern District of California, Case No. 11-CR-846. Hid over $8.4 million in an HSBC India account. Case went to trial, sentencing guidelines called for a sentence between 78-96 months. Judge granted a 72 month variance and sentenced defendant to 6 months in prison and 6 months of home detention.

- Paul Zabczuk, Southern District of Florida, Case No. 10-CR-60112. Directed his foreign clients to make payments to his company through offshore accounts he controlled in the Bahamas and Switzerland and further funded those offshore accounts through other payments. Court granted 5K1.1 motion to depart down six months. Court varied down another 18 months and sentenced defendant to 3 years' probation, 12 months' home detention, 150 hours of community service.

- Steven Rubinstein, Southern District of Florida, Case No. 09-CR-60166. Hid approximately $7 million in undisclosed UBS accounts he used to purchase real estate and South African Kruggerands. Sentenced to 3 years' probation, 12 months' home detention.

- John McCarthy, Central District of California, Case No. 09-CR-784. Transferred over $1 million to an undisclosed UBS account and regularly communicated with UBS representatives to authorize transactions. Court accepted 5K1.1 motion for downward departure. Sentenced to 3 years' probation, 6 months' home detention, and 300 hours of community service.

- Arvind Ahuja, Eastern District of Wisconsin, Case No. 11-CR-135. Convicted in jury trial of willfully filing a false return and willfully failing to file an FBAR due to a failure to disclose more than $8.5 million held in bank accounts at HSBC India. Court varied from a guideline range of 41-51 months to a sentence of 3 years probation, 3 months home detention, a $350,000 fine, and 450 hours community service.

- Sybil Nancy Upham, Southern District of New York, Case No. 14-CR-82. Unreported accounts at UBS and in a Liechtenstein foundation. Court granted a 5K1.1 motion and Court varied from a guideline range of 30-37 months to a sentence of 3 years probation and 300 hours of home detention.

- Jules Robbins, Southern District of New York, Case No. 10-CR-333. Created a sham Hong Kong Corporation to be listed as the nominal holder of his UBS accounts containing nearly $42 million. Sentenced to 12 months' probation.

- Ernest Vogliano, Southern District of New York, Case No. 10-CR-00327. Opened UBS accounts in the names of Liechtenstein and Hong Kong shell corporations. Actively used funds and transferred some after learning of the criminal investigation. Sentenced to 2 years' probation.

- Leonid Zaltsberg, District of New Jersey, Case No. 10-CR-437. Transferred his UBS accounts to a nominee Panamanian corporation for the purpose of hiding them from the IRS and, as found by the District Court at sentencing, "made a conscious and calculated decision to hide money offshore." Sentenced to 4 years' probation, 12 months' home detention.

- Jeffrey Chatfield, charged in the United States District Court for the Southern District of California, Case No. 10-CR-4546. Held UBS account in the name of a nominee entity. Sentenced to 3 years' probation.

## VII. The Need to Provide Restitution to Any Victims of the Offense

The only victim in the case, the United States Treasury, has been paid full restitution with interest as of February 2, 2017. No further amount of restitution is owed.

## VIII. A Sentence of Probation with Special Conditions is Appropriate

The Supreme Court has said that "the punishment should fit the offender and not merely the crime." *Pepper*, 131 S. Ct. 1 at 1240 (internal quotations omitted). There are many ways a defendant is punished, and this Court will ultimately decide the appropriate punishment in this case.

Dan has, to some extent, been punished already. Aside from the extraordinary financial sanctions here, Dan has been shamed in public and has lost his Professor Emeritus status, which took nearly four decades to achieve. Dan's personal physician, Alexander Kurchin, M.D., F.A.C.S., captured this point the best:

> The news of his indictment travelled quickly, both in Rochester and Israel. In anticipation of this legal proceeding, he resigned from his position in the Simon Business School and later gave up his title as Professor Emeritus. A brilliant and respect career of 35 years was abruptly and shamefully terminated. Even before

formal sentencing, he has been severely punished and this event will follow him to his last day.

Dan Horsky is paying dearly for his mistakes and will continue to do so for the rest of his life.  Dan does not seek to diminish the gravity of his conduct, but he respectfully asks the Court to consider all of the facts above—not only his criminal conduct, but an otherwise lawful and productive life,  a serious error in his judgment in establishing an account that concededly compounded itself over the years, his extraordinarily high tax and penalty payments and his extensive cooperation.

We respectfully suggest that a sentence of probation with a special condition of community service is warranted here by (i) Dan's payment of extremely high financial penalties and restitution of approximately $125 million; (ii) his extraordinary cooperation with the government detailed in sealed filings by both the Department of Justice and the defendant, (iii) his otherwise exemplary life and contributions and (iv) the sentences being imposed by the majority of courts on similarly situated defendants.  It is also justified by his character, as reflected in the numerous letters submitted to the Court.

We most respectfully suggest that using Dan's demonstrated skills in this area is a far better resolution for the community than sentencing him to incarceration, and it would adequately reflect the seriousness of the offense, promote respect for the law, and provide just punishment.

## <u>CONCLUSION</u>

Based upon the information contained in this memorandum, we respectfully ask the Court to sentence Dan Horsky to a term of probation conditioned upon community service.

Accordingly, the Court should impose a sentence of probation, supplemented with special conditions appropriate to his crime and that would assist the community.

Dated: February 4, 2017

Respectfully submitted,

\_\_/s/ Matthew C. Hicks_____
MATTHEW C. HICKS
Virginia Bar Number 48377
MARK E. MATTHEWS
CAPLIN & DRYSDALE, CHTD.
One Thomas Circle, N.W., Suite 1100
Washington, D.C. 20005
Telephone: (202) 862-7852
Facsimile: (202) 429-3301
E-Mail: mhicks@capdale.com

SETH KOSSMAN
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC
100 Light Street, 19th Floor
Baltimore, MD 21202
Telephone: (410) 862-1095
Facsimile: (443) 263-4198
E-Mail: skossman@bakerdonelson.com

## CERTIFICATE OF SERVICE

I certify that on February 4, 2017, I filed the foregoing Defendant's Sentencing Memorandum in Support of a Sentence of Probation With Special Conditions with the Clerk of Court using the CM/ECF system, which will serve notice of this filing on all parties registered to receive such notice, including the United States of America. A copy has also been sent via email to the following:

> Nina S. Blanchard
> Senior United States Probation Officer
> Email: Nina_Blanchard@vaep.uscourts.gov

> \_\_/s/ Matthew C. Hicks_____
> MATTHEW C. HICKS
> Virginia Bar Number 48377
> CAPLIN & DRYSDALE, CHTD.
> One Thomas Circle, N.W., Suite 1100
> Washington, D.C. 20005
> Telephone: (202) 862-7852
> Facsimile: (202) 429-3301
> E-Mail: mhicks@capdale.com